UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

**MELET WOLDEMARIAM**,

Plaintiff,

– against –

**ROBERT F. KENNEDY, JR., SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**,

Defendant.

---------------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

18-CV-297 (AMD) (VMS)

**ANN M. DONNELLY**, United States District Judge:

On January 16, 2018, the plaintiff filed this action against her former employer, the Secretary of the United States Department of Health and Human Services ("HHS"), alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). (ECF Nos. 1, 97.)[1] Before the Court is the defendant's unopposed motion for partial summary judgment on the plaintiff's Title VII and ADEA discrimination and retaliation claims predicated on her 2012 transfer and step increase, performance evaluations, twelve promotion decisions, merit raises, "PIV" card renewal issues, and termination. (ECF No. 167.)[2] For the reasons that follow, the defendant's motion is granted.

---

[1] The plaintiff's complaint named Xavier Becerra as Secretary of Health and Human Services. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes the prior defendant for the above listed defendant and respectfully directs the Clerk of Court to amend the caption to reflect this change. Fed. R. Civ. P. 25(d).

[2] The defendant does not move for summary judgment on the plaintiff's discrimination claims for failure to promote her to the position of Microbiologist in 2013. (ECF No. 168 at 10 n.2.)

## BACKGROUND

### I. Factual Background[3]

#### a. FDA Employment History

The plaintiff, a Black woman, was born in Ethiopia in 1961. (ECF No. 97 ¶ 9; Def. 56.1 ¶¶ 15–16.) She graduated from Hunter College of the City University of New York in 2002 with dual Bachelor of Science degrees in chemistry and biology. (ECF No. 97 ¶15; Def. 56.1 ¶17.) She worked for the defendant, at the Food and Drug Administration ("FDA"), from October 2008 until April 2022, when the FDA terminated her employment. (ECF No. 97 ¶ 17; Def. 56.1 ¶¶ 21, 165; *see also* ECF No. 170-13 at 3.) The plaintiff started at age forty-seven as a full-time Biological Science Lab Technician, 0404, in the Microbiology Branch at the Northeast Regional Laboratory. (Def. 56.1 ¶ 24.) She started as GS-6, Step 1 on the federal pay scale with the potential for promotion to the GS-9 level in her position. (Def. 56.1 ¶ 26; ECF No. 170-21 at 2 (Notification of Personnel Action, Standard Form 50 ("SF-50")).) In this role, she assisted with

[3] The factual background is based on the Court's review of the entire record, including the defendant's submissions; the defendant's Rule 56.1 statement of fact, which cites extensively to supporting exhibits (*see* ECF No. 169 ("Def. 56.1")); and all 99 of the defendant's supporting exhibits (*see* ECF Nos. 170–73).

The plaintiff did not respond to the defendant's Rule 56.1 statement, or the defendants' summary judgment motion, despite repeated warnings. (*ECF Orders dated June 10, 2025*; *June 16, 2025*; *Sept. 18, 2025*; *Oct. 21, 2025*; *Oct. 30, 2025*; *Nov. 20, 2025*; *Nov. 25, 2025*; and *Feb. 4, 2026*.) Accordingly, the Court deems "the facts set forth in the defendant's Rule 56.1 statement . . . admitted for the purposes of the defendant's motion for summary judgment," (*ECF Order dated Nov. 20, 2025* (citation modified)) and deems the motion fully briefed (*ECF Order dated Feb. 4, 2025*). The Court has thoroughly reviewed the entire record, and unless otherwise noted, "considers the . . . facts, proffered by the Defendants and supported by documentary evidence, to be undisputed for the purposes of this motion." *Israel v. City of New York*, No. 11-CV-7726, 2012 WL 4762082, at *1 (S.D.N.Y. Oct. 5, 2012) (citing *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004)); *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (quoting *Jones v. Lamont*, No. 05-CV-8126, 2008 WL 2152130, at *1 (S.D.N.Y. May 22, 2008) ("In view of [*pro se* ] plaintiff's failure to respond to the motion, the well supported factual allegations set forth in defendants' Rule 56.1 statement are deemed admitted.")).

testing food and analyzing it for potential contaminants or microorganisms. (Def. 56.1 ¶¶ 7, 22, 30; ECF No. 170-20 ("2014 Dep.") 18:25–20:7.)

Although the plaintiff complained to her supervisors in August 2010 and March 2011 about not being promoted "commensurate with her education and experience" (ECF No. 97 ¶ 30, 33), the FDA promoted her in October 2010 to GS-7, Step 1, and again in October 2011 to GS-8, Step 1, increasing her compensation both times (Def. 56.1 ¶ 28–29; ECF Nos. 170-25 at 2, 171-1 at 2 (SF-50s)). In February 2012, the FDA reassigned the plaintiff from the Microbiology Branch to the Chemistry Branch; she kept the same position — Biological Science Lab Technician, 0404, GS-8, Step 1 — and compensation. (Def. 56.1 ¶ 31; ECF No. 171-2 at 2 (SF-50); 2014 Dep. 23:10–24:6.) In October 2012, the FDA promoted her to the highest grade available for her position — GS-9 — at Step 1, and increased her compensation. (Def. 56.1 ¶ 33; ECF No. 171-4 at 2 (SF-50).) Throughout her employment, until the end of 2020, the plaintiff was promoted, and received cash, time off awards, and positive performance reviews, including several "Outstanding" assessments. (Def. 56.1 ¶¶ 61–78; *see also* ECF Nos. 172-3–172-7, 172-9–172-16 (performance reviews).)

**b. 2010–2013: Job Applications and First OEEO Complaint**

The plaintiff alleged in her complaint that in 2010, 2011, and 2012, she repeatedly complained to her supervisors that the FDA hired or promoted people less qualified than she was, and that the supervisors never responded to her complaints. (ECF No. 97 ¶¶ 29–37; *see, e.g.*, ECF No. 172-20 at 2–3 (requesting promotion to an analyst position).) In November 2012, the plaintiff asked to "be converted" from her "[t]echnician" career track to the "professional series" — a chemist, biologist, or microbiologist career track — which would lead to higher pay and promotion. (ECF No. 172-24 at 2–3.) Melanie Bailey, a Supervisory Administrative

Management Specialist in the laboratory where the plaintiff worked, told the plaintiff that the FDA would be posting vacancies for "Chemist" positions soon, and invited the plaintiff to apply. (*Id.* at 2.) In February 2013, the plaintiff applied to be a Microbiologist. (Def. 56.1 ¶ 91; ECF No. 170-22 ("Feb. 2023 Dep.") 70:6-14.)[4] She had an interview, but was not selected for the position. (Def. 56.1 ¶ 92; 2014 Dep. 81:15-17; ECF No. 173-15 at 91–92.) She emailed Lawrence James, then the Acting Director of the Microbiology Branch, to find out why she did not get the position, and he responded that the interviewers said she was 15 minutes late, that she started the interview by complaining about not being promoted, and that her answers were "short and incomplete." (ECF No. 173-15 at 98–99.)

In June 2013, the plaintiff contacted a counselor at the FDA's Office of Equal Employment Opportunity ("OEEO") and alleged that the FDA discriminated against her based on sex, national origin, and age when it did not select her for the Microbiologist position. (Def. 56.1 ¶¶ 167–68; *see also* ECF No. 170-11 at 1–2.) In a September 2, 2013 letter, the EEO counselor notified the plaintiff that she could file a formal EEO complaint within fifteen days. (ECF No. 173-15 at 28–29.) On October 6, the FDA promoted the plaintiff to GS-9, Step 2, and increased her compensation. (Def. 56.1 ¶ 35; ECF No. 171-6 at 2 (SF-50).) She filed a formal Equal Employment Opportunity ("EEO") employment discrimination complaint on October 11, 2013. (Def. 56.1 ¶ 169; ECF No. 173-15 at 31.)

The plaintiff alleged that she also applied for about 12 other positions in 2013 but was not selected because of "discriminatory and retaliatory reasons." (ECF No. 97 ¶¶ 72–80, 89; *see also* Def. 56.1 ¶¶ 93–124.) The plaintiff was not qualified for two positions (Def. 56.1 ¶¶ 113–

[4] The plaintiff alleged that there were two open slots for this position (ECF No. 97 ¶ 73), and that younger men who were not Ethiopian got the positions (ECF No. 97 ¶¶ 49–53).

18), and the FDA did not select her for three positions (Def. 56.1 ¶¶ 93–97). The FDA offered the plaintiff a Chemist position on November 25, 2013, at GS-09, Step 2, with promotion potential to GS-12. (*Id.* ¶¶ 121–22; ECF No. 173-11 at 2.) But she declined the job because she thought it should pay more. (ECF No. 173-10 at 2–6.)[5] The FDA does not have a record that plaintiff actually applied for three of the six remaining positions (Def. 56.1 ¶¶ 99–101), and the FDA did not hire anyone for the other three positions (Def. 56.1 ¶¶ 102–12).

In March 2014, the plaintiff's supervisor, Sarah Skorupsky, rated her "Fully Successful" — the second best of four possible ratings — in her performance review for the period of January 1, 2013 to December 31, 2013. (*Id.* ¶¶ 66–69; ECF No. 172-7 at 2.) Skorupsky also noted that there were instances of "late samples," "yelling, outbursts, obtuse/negative demeanor," and that "closing out reports/turning in worksheets" was "sometimes a problem," but that the plaintiff could "also be lovely to work with" and was "technically very capable + knowledgeable!" and "very helpful with new hires and interns." (Def. 56.1 ¶ 70; ECF No. 172-7 at 4–5.)[6] Despite the negative observations in this performance review, the FDA subsequently promoted the plaintiff to the next step and increased her compensation in October 2014, October 2015, April 2017, October 2017, May 2019, and September 2020. (Def. 56.1 ¶¶ 37–38, 41–42, 45, 52; ECF Nos. 171-8 at 2, 171-9 at 2, 171-10 at 2, 171-13 at 2, 171-14 at 2, 171-17 at 2, 171-24 at 2 (SF-50s).) The FDA also gave the plaintiff cash and time off awards throughout her employment, including in June 2016, September 2019, April 2020, and March 2021. (*See, e.g.*,

---

[5] Years later, the plaintiff emailed a senior FDA administrator requesting that she be "granted a GS-12.6 Chemist position" because it was "the natural evolution of the GS-9 Chemist position that the Agency offered me in November 25, 2013, a position I accepted." (ECF No. 173-18 at 2.)

[6] Skorupsky handwrote these comments on the plaintiff's performance review (ECF No. 172-7 at 4–5), as she did on all employee performance reviews that she completed for the same time period (Def. 56.1 ¶¶ 70–71; *see* ECF No. 172-8 (2013 performance reviews where Skorupsky was the rating official).)

Def. 56.1 ¶¶ 39–40,46–47, 49–50, 53; ECF Nos. 171-11 at 2, 171-12 at 2, 171-18 at 2, 171-19 at 2, 171-21 at 2, 171-22 at 2, 171-25 at 2 (SF-50s).)

On November 3, 2015, the plaintiff amended her 2013 EEO claim and added allegations that the FDA retaliated against her for making an EEO complaint about the negative comments in the 2013 performance review. (Def 56.1 ¶ 172; ECF No. 173-16 at 2.) She also added allegations of discrimination based on the denials of her 2014 application for a Chemist position, and her applications for multiple Microbiologist positions; she alleged that the microbiologist positions were limited to recent college graduates. (Def. 56.1 ¶ 173; ECF No. 173-16 at 2.)[7]

On April 7, 2017, the Equal Employment Opportunity Commission ("EEOC") held a hearing and issued a bench decision granting summary judgment to the FDA. (*See* ECF No. 173-20; Def. 56.1 ¶ 176.) Administrative Judge ("AJ") Erin M. Stilp found that the plaintiff did not state a *prima facie* claim of retaliation related to the FDA's decision not to hire her as a Microbiologist. (ECF No. 173-20 at 4.) As for the other positions, AJ Stilp concluded that although the plaintiff stated a *prima facie* claim of discrimination "merely because the selectees were outside of [her] protected basis" — younger males of a different national origin — the FDA "articulated a legitimate, non-discriminatory reason for its nonselection": that the plaintiff was late to her interview, complained during the interview that she had not been promoted, and did not answer the interviewer's questions completely. (ECF No. 173-20 at 4.) Moreover, AJ Stilp noted that the plaintiff did not offer any evidence of pretext. (*Id.*) On May 1, 2017, the EEOC entered judgment in the FDA's favor. (*Id.* at 7.) In a letter dated June 15, 2017, the EEOC gave the plaintiff notice of its final order. (*See* ECF No. 173-16.) The plaintiff filed this lawsuit in

[7] The plaintiff's applications for these positions are not part of this action. (*See* ECF No. 168 at 15 n.4; Def. 56.1 ¶ 193; *see also* ECF No. 97.)

January 2018 and continued to work for the FDA. (ECF No. 1; *see, e.g.*, ECF No. 171-15 (May 2018 SF-50).)

**c. 2020 – 2022: Expired PIV Card, Termination, and Second OEEO Complaint**

When the plaintiff worked for the FDA, all federal employees were required to have a current identification card, called a "PIV card," to access federal facilities and information systems. (Def. 56.1 ¶¶ 125–30.) The government required two valid "unexpired" forms of acceptable identification to issue or re-issue a PIV card. (*Id.* ¶ 131; ECF No. 173-12 at 660–61.)

By April 2020, due to the Covid-19 pandemic, "HQ" had directed labs to stop processing PIV cards "because of the contact needed to process PIV cards" and instead "extend[ed] people[']s cards." (ECF No. 173-12 at 470; *see also* ECF No. 173-12 at 441 ("As a result of the pandemic, our PIV processing room was shut down in early 2020, as we were given a directive not to process the PIVs.").)[8] On April 7, 2020, the plaintiff emailed Melanie Bailey, who had previously helped the plaintiff with HR issues, for assistance renewing her PIV card. (ECF No. 173-12 at 298, 300, 445.) Bailey responded the same day that the lab was "not renewing cards at this time." (ECF No. 173-12 at 445.) She advised the plaintiff to contact Kyra Groves, Administrative Management Specialist, in May. (*Id.* at 445, 470.) The plaintiff testified that she tried calling Groves in May or June 2020, but could not reach her. (Feb. 2023 Dep. 209:2–5.) The plaintiff told Bailey that she had trouble reaching Groves, so Bailey told her to contact Tabitha Seminaro, another Administrative Management Specialist. (ECF No. 173-12 at 300.)

The plaintiff's PIV card expired on June 30, 2020. (Def. 56.1 ¶ 133; Feb. 2023 Dep. 206:25–207:4.) The plaintiff's New York State identification card had expired before 2020, and

[8] In her March 7, 2023 EEOC affidavit, Melanie Bailey did not recall if they did not renew the plaintiff's PIV card because they were not renewing any PIV cards during the COVID-19 pandemic or because it was too early to renew the plaintiff's card. (*See* ECF No. 173-12 at 300, 305.)

she did not have a passport or any other acceptable form of identification to renew her PIV card. (Def. 56.1 ¶¶ 134–37; Feb. 2023 Dep. 209:11–212:25.) She tried to make appointments to renew her New York State ID starting in May 2020, over the phone and in person. (Feb. 2023 Dep. 215:3–216:8.) She scheduled an appointment for November 2020, but missed it; she missed at least one subsequent DMV appointment because she had been exposed to Covid-19 where she worked, and did not want to spread it. (*Id.* at 216:8–217:8.) She finally renewed her New York State ID on June 29, 2021. (*Id.* at 220:19–221:5.)

The plaintiff did not have a valid PIV card from June 30, 2020 through the termination of her federal employment in April 2022, so she could not get access to the lab or FDA information systems without assistance. (Def. 56.1 ¶ 137; ECF No. 173-12 at 417–18.) She also could not work from home because she needed a valid PIV card to access her computer. (*See* Feb. 2023 Dep. 77:2-5; ECF No. 173-12 at 284.)

From June 30, 2020 through about May 2021, other FDA employees had to sign the plaintiff in as a visitor and escort her to her lab, and the FDA's Information Technology ("IT") department had "to provide temporary passwords on a regular and recurring basis." (ECF No. 173-12 at 417–18; *see, e.g.*, ECF No. 173-12 at 377–78, 386.) On August 20, 2020, the plaintiff again reached out to Kyra Groves in HR for help renewing her PIV card. (ECF No. 173-12 at 446–47.) Groves scheduled an appointment for August 28, 2020, to discuss the PIV card, but the plaintiff did not attend, even though she was at work. (*Id.* at 417, 446.)

On January 25, 2021, Dominique Stutts, director of the Chemistry Branch, told Albert Thompson, the plaintiff's supervisor, to resolve the plaintiff's PIV card issue. (*Id.* at 348.) On March 15, 2021, the plaintiff went to an appointment to renew her PIV card, but did not have two valid forms of identification. (*Id.* at 418.) Shortly thereafter, Kyra Groves asked the

plaintiff if there was "anything [the plaintiff] need[ed] on our end or hers to process the PIV." (*Id.* at 362.) On March 25, 2021, Stutts emailed Groves, copying Thompson, "for a status update regarding [the plaintiff]'s PIV card." (*Id.* at 361.) Groves responded that she was ready to process the PIV card, but the plaintiff "didn't have the 2 forms of ID needed to process her application." (*Id.* at 361.) Thompson responded that two forms of ID would not have been required if the PIV card renewal had been processed when the plaintiff originally asked for help renewing it on April 7, 2020. (*Id.* at 360–61.)[9] Groves replied that it was "HQ's decision" to extend PIV card renewals because "we were in the beginning of the pandemic" and wanted to minimize "the contact needed to process PIV cards." (*Id.* at 360.) On March 29, 2021, the plaintiff missed another appointment to renew her PIV card, although she was at work that day. (*Id.* at 418.)

On May 12, 2021, Stutts warned the plaintiff that her PIV card had been expired for a year, and that she would not be allowed to enter the building if she did not renew it by May 19, 2021. (Def. 56.1 ¶ 138; ECF No. 173-12 at 386; Feb. 2023 Dep. 223:16-25; 232:25–233:6.) She also informed the plaintiff that the "current work around of granting you building access *via* a visitor entrance procedure has also expired," but that security would allow her "onsite for one additional week from today," until May 19, 2021. (ECF No. 173-12 at 386.) On May 17, 2021, the plaintiff emailed Bailey, copying Thompson, for help with her PIV card that day. (*Id.* at 309, 316.) Bailey looped in additional administrators to help, including Groves, who was "currently out of the office" but offered to "assist by email in anyway;" Groves also sent the plaintiff

[9] According to the list of "acceptable identity source documents," a PIV card can be a "Primary" document. (ECF No. 173-12 at 660–61.) "[T]wo identity source documents" are required; one of them must be a "Primary" document, and the other may be a "Primary" or a "Secondary" document. (*Id.*) The plaintiff testified that she has a "citizen certificate" (Feb. 2023 Dep. 210:18–211:8), which appears to be a valid Secondary document (*see* ECF No. 173-12 at 661).

information about acceptable identification. (*Id.* at 315–16, 457–59.) Tabitha Seminaro planned to assist the plaintiff with her appointment that week. (*Id.* at 313.) On May 20, 2021, Seminaro emailed Bailey that she could not "process [the plaintiff's] background check because she gave me two expired ids," "she doesn't have the passport," and "[t]hey won't accept the expired ids." (*Id.* at 317.)[10] The plaintiff told Seminaro that she would get a new driver's license on June 29, 2021. (*Id.* at 317.)

Later that day, Stutts emailed the plaintiff, copying Thompson and Laboratory Director John Leazer:

> As per the Federal Protective Service Post Desk Book, all persons entering a federal building must present a valid, approved photographic identification prior to entry.
>
> In adherence to federal security guidance, you will be denied building access beginning May 21, 2021 should you not present this identification. However, with the presentation of this valid photographic identification, you can and will be allowed building access.
>
> In the event you do not present a valid photographic identification and are denied building access, you may consider using annual leave for the day.

(*Id.* at 318–19; *see also* Def. 56.1 ¶ 139; Feb. 2023 Dep. 201:19-22.)[11] On June 15, 2021, Stutts directed Thompson by email to contact the plaintiff and "bring to the conclusion what type of

[10] The plaintiff gave Seminaro an expired driver's license and the expired PIV card. (ECF No. 173-12 at 317.)

[11] Thompson opined in his March 17, 2023 EEOC affidavit that the plaintiff had been on "administrative leave" because she "was ordered home" and "told not to report to work by Ms. Stutts," "who knew her piv card and state id had expired and that they were difficult to be renewed." (ECF No. 173-12 at 333–34.) He also "believe[d] management was discriminating against" the plaintiff because "they placed obstacle[s] in the way so she could not renew her piv card," "subsequently ordered her to stay home," and it was "[a]ll . . . designed to terminate her." (*Id.* at 334.) He did not explain why he thought the "obstacles" that "management" placed in the plaintiff's way were discriminatory but claimed that he and all of his direct reports were also "victims" of discrimination because they were all "minorities" and that "[i]t is apparent that management is bias[ed] [in favor of] Caucasian[s]." (*Id.* at 335.)

leave she will be requesting (if any) for her absences since May 21st, 2021" and to update Stutts "on when and how she intends to resolve the issues related to her PIV card." (ECF No. 173-12 at 348–49.)[12] Thompson responded that the plaintiff's absence should be classified as administrative leave because "federal security guidance" barred the plaintiff from the building. (*Id.* at 347.) The same day, Stutts reassigned Thompson to a different position and made Thomas Herbst the temporary supervisor of the plaintiff's lab. (*Id.* at 280, 379.) Herbst contacted the plaintiff almost daily to get her to come back to work and renew her PIV card. (*Id.* at 379; *see also id.* at 573–608 (Herbst's chronology of outreach to the plaintiff).)

In a June 29, 2021 letter, Herbst "**ordered**" the plaintiff "**to obtain a current PIV Card immediately**." (ECF No. 173-12 at 417 (emphasis in original).)[13] He wrote that she had still not renewed her PIV card "[d]espite help from management," including from her supervisor, who took time from his own work to escort her because she did not have a PIV card, and from the FDA's IT department, who continually gave her temporary passwords. (Def. 56.1 ¶ 140; ECF No. 173-12 at 417–18.) Herbst included in the letter a list of the plaintiff's requests for assistance renewing her PIV card and of the scheduled appointments for her to do so. (ECF No. 173-12 at 417–18.) The plaintiff had four appointments scheduled between August 2020 and May 2021; she either did not attend, or did not bring proper identification to any of them. (*Id.* at 417–18.) Herbst "**directed**" the plaintiff "**to report to duty upon receipt of this notice and/or to arrange reporting to duty with [him] immediately**," and warned that "failure to follow this direct order may result in disciplinary or adverse action against you up to and including removal

[12] Dr. Leazer twice ordered Thompson, once verbally and once by email, to help the plaintiff get a PIV card. (ECF No. 173-12 at 400–01.)

[13] As noted above, by June 29, 2021, the plaintiff had renewed her New York State ID. (Feb. 2023 Dep. 220:19–221:5.)

from Federal service." (*Id.* at 418 (emphasis in original).) Herbst told her she could contact him for assistance. (*Id.*) The plaintiff did not come to work or contact Herbst, and her administrative-leave status ended on July 6, 2021, after which she was considered AWOL. (*Id.* at 285.)

Although the plaintiff did not contact Herbst, she wrote to other senior officials at the lab. (*Id.* at 287.) For example, in an August 2, 2021 letter to Dr. Leazer, she wrote:

> I am requesting the FDA/ORA/ORS/NFFL to grant me immediate access to the FDA Jamaica, N.Y. Laboratory to return to work. As my 7-13-21 certified letter to you states, I am ready, willing, and able to return to work immediately. I am not resigning, retiring, on sick leave, or annual leave.
>
> If do not receive permission (in writing, by August 9, 2021) to access the building, I will file a case in court.
>
> If you are not the appropriate person to receive this message, please let me know who is the person to contact.
>
> The reason I have been out since May 21, [2021] is that on May 20, 2021 Dominique Stutts sent me a letter ordering me to stay away until I acquired a valid FDA ID. However, that is a Catch-22: an impossible situation without a solution. In order for me to enter the FDA Jamaica, N.Y. Building, I must have an FDA-PIV ID, which I don't. To get an FDA-PIV ID, I must enter the FDA Jamaica, N. Y. Building, which I can't do.

(*Id.* at 407.)

Herbst notified the plaintiff by letter dated August 17, 2021 that she was in danger of being removed from federal service because she (1) failed to report for duty after being ordered to do so; (2) was absent from work without authorization from July 6, 2021 to August 17, 2021; and (3) did not report for duty despite continuous efforts by the FDA to contact her from at least July 6, 2021 to August 17, 2021. (Def. 56.1 ¶¶ 141–45; ECF 173-12 at 562–68.) Herbst also advised the plaintiff that she had a right to reply to the notice orally or in writing and to submit evidence. (Def. 56.1 ¶ 146; ECF No. 173-12 at 565.) The plaintiff requested and received an

extension to reply. (Def. 56.1 ¶¶ 147–48; ECF No. 173-12 at 388–89, 530–31.) In her written reply, dated September 24, 2021, the plaintiff said that Stutts "*deprived* me access to the [] Laboratory because of my expired PIV card. Her order put me in an impossible situation: being unable to access the building because of my expired PIV card, and being also unable to renew my PIV card, because I can't access the building." (ECF No. 173-12 at 388 (emphasis in original).) The plaintiff also wrote that she was "stuck in the impossible predicament," because she asked for access to the building so that she could return to work but "nobody in FDA management has granted me permission to return to work." (*Id.*)

In an October 25, 2021 letter, the FDA notified the plaintiff that the charges against her — failure to follow a direct order, unauthorized absence, and unwillingness to report for duty — were sustained and that she was removed from federal service. (Def. 56.1 ¶¶ 149–53; ECF No. 173-12 at 530–35.) In an affidavit to the HHS EEO investigator, Herbst explained that he recommended that the plaintiff be dismissed because she was absent without leave, did not follow instructions, and repeatedly failed to show up when scheduled to renew her PIV card. (ECF No. 173-12 at 13–14, 282–83.)

In a February 14, 2022 letter, the FDA notified the plaintiff that it had rescinded the earlier notice of removal from federal service because it had not given her union a copy of the August 2021 notice pursuant to the Collective Bargaining Agreement between the union and HHS. (Def. 56.1 ¶¶ 154–55; ECF No. 173-12 at 528.) The plaintiff returned to work as a Biological Science Technician, GS-0404-09, on February 22, 2022, apparently still without a PIV card, but with a photo ID. (Def. 56.1 ¶¶ 156–59; Feb. 2023 Dep. 236:13–237:4; ECF No. 173-12 at 381.) The FDA reopened her termination proceedings once she returned. (*See* ECF No. 173-12 at 521.) The plaintiff never formally explained during those proceedings why she

did not work between May 21, 2021 and February 22, 2022, despite receiving an extension to do so. (*Id.* at 381, 521.) The FDA notified the plaintiff in an April 26, 2022 letter that she was being removed from federal service, and it terminated her federal employment the same day. (Def. 56.1 ¶¶ 160–65; ECF Nos. 172-1 at 2 (SF-50), 173-12 at 521–27.)[14] The security staff escorted her out of the building and off the premises. (ECF No. 173-12 at 381.) The plaintiff was paid from February 22, 2022 to April 26, 2022. (Def. 56.1 ¶ 166; ECF 173-14 ("Dec. 2023 Dep.") 317:21–318:5.)

On June 6, 2022, the plaintiff contacted an OEEO counselor at the FDA and alleged that she experienced discrimination and harassment based on age, national origin, sex, as well as retaliation for her earlier EEO complaint. (Def. 56.1 ¶ 177–78; ECF No. 173-12 at 39–45.) She filed a formal discrimination complaint on or about August 31, 2022. (Def. 56.1 ¶ 179; *see* ECF No. 173-12 at 259–60.) She alleged that she had been subjected to harsh treatment, harassment, and abuse since she filed the first EEO complaint in 2013. (Def. 56.1 ¶ 180–81; ECF No. 173-12 at 262–66.) She also alleged that she was targeted for discriminatory retaliation because she filed this lawsuit in 2018. (ECF No. 173-12 at 262–66.) In a January 18, 2023 letter to the plaintiff's counsel in this matter, the FDA OEEO "accept[ed] the claims for an investigation." (*Id.* at 266.) The OEEO also said that the plaintiff's complaint would "be assigned to an investigator for a formal investigation of the accepted claims." (*Id.*) On February 14, 2023, the plaintiff's counsel notified the assigned EEO investigator by email that the plaintiff was going to pursue her claims in this action in federal court, not with the OEEO. (Def. 56.1 ¶¶ 183, 186;

[14] According to the Notification of Personnel Action (SF-50), the effective removal date was April 27, 2022. (*See* ECF No. 172-1 at 2.)

ECF No. 173-12 at 273.) On May 12, the plaintiff completed the FDA's "Election of Remedies Form," and requested a civil court action. (ECF No. 173-23 at 2–3.)

## II. Procedural Background

As noted above, the plaintiff, who was then represented by counsel, filed this action on January 16, 2018, alleging discrimination based on sex, national origin, and age. (ECF No. 1; *see also* Def. 56.1 ¶ 187.) She did not assert any retaliation claims in her original complaint. (ECF No. 1; *see also* Def. 56.1 ¶ 188.) After protracted discovery, on September 22, 2023, the plaintiff amended her complaint to add allegations of retaliatory termination. (ECF No. 97; *see also ECF Orders dated Apr. 26, 2022*, and *June 1, 2022.*) She alleged discrimination and retaliation in violation of Title VII and the ADEA based on age, national origin, and sex, and sought lost wages, benefits, and damages for "severe and extreme mental and emotional distress, anguish, humiliation, embarrassment, fright, shock, pain, discomfort, anxiety, injury to person, injury to reputation, loss of enjoyment of life, and other nonpecuniary losses." (ECF No. 97 ¶¶ 184–211.)

At a status conference before the Court on December 12, 2024, the defendant's counsel advised the Court that "mediation would be productive and that the parties should proceed to mediation," but that the plaintiff had not given the defendant a damages calculation, and it was "really difficult . . . to proceed towards resolution," since the defendant "d[i]dn't know what she's looking for. (ECF No. 143 at 3–4.) On December 18, 2024, at the parties' request, Magistrate Judge Vera M. Scanlon referred the case to mediation. (*ECF Orders dated Dec. 12, 2024*, and *Dec. 18, 2024.*)[15] Judge Scanlon ordered the parties to complete mediation by March

[15] As the Court noted at the December 12, 2024 conference, Judge Scanlon presided over this case with "extraordinary patience." (ECF No. 143 at 4.)

3, 2025 (*ECF Order dated Dec. 18, 2024*), but granted at least three extensions (*see ECF Orders dated Jan. 2, 2025*; *Jan. 22, 2025*; and *Mar. 25, 2025*), and ordered the parties to complete mediation and file a joint status report on the outcome by May 30, 2025 (*ECF Order dated Mar. 25, 2025*). On May 19, 2025, the defendant requested a status conference "in light of the fact that there has been an apparent breakdown in communication between [the p]laintiff and her counsel." (ECF No. 141 at 1.) According to the defendant, "despite [its] multiple requests . . . and the passage of nearly five months since the mediation order, [the p]laintiff ha[d] apparently failed to give her counsel authorization to convey a settlement demand to" the defendant. (*Id.*) Defense counsel also said that the plaintiff's counsel informed it "that he has been trying to contact his client for weeks, but she has failed to respond." (*Id.*) The Court scheduled a status conference for June 10, 2025. (*ECF Order dated May 19, 2025.*) At that status conference, the Court ordered the parties to file a joint status report explaining whether they had agreed on attorney fee allocation for mediation and a date for mediation by June 13, 2025. (*ECF Minute Order dated June 10, 2025.*) The Court also ordered the plaintiff to file a letter with a calculation of damages by June 18, 2025. (*Id.*)

On June 13, 2025, the parties explained in a joint status report that the plaintiff's counsel "ha[d] no option but to seek to withdraw as counsel of record for the [p]laintiff for numerous reasons, including Ms. Woldemariam's failure to cooperate and communicate" and their "divergent positions regarding settlement and other matters." (ECF No. 144 at 1.) The defendant also stated that mediation was no longer "a viable option." (*Id.* at 2.) The defendant repeated its request for a computation of damages pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii). (*Id.*) The Court set deadlines for the defendant's Rule 56.1 statement, the plaintiff's statement of damages and any Rule 56.1 counterstatement, and the defendant's summary judgment motion.

(*ECF Order dated June 16, 2025.*) The Court warned the parties that "[g]iven the age of the case, the Court will not grant any further extensions, unless there are truly extraordinary circumstances." (*Id.*) The Court also warned the plaintiff that *pro se* litigants must comply with the Court's orders, including scheduling orders, and that if she did not do so, the Court may impose sanctions, including dismissing her case. (*Id.* (citing *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008)).) On August 29, 2025, Judge Scanlon granted the plaintiff's counsel's motion to withdraw, finding that the attorney-client relationship had "irrevocably broken down" because the plaintiff would not pay the attorney or communicate with him about her case. (*ECF Order dated Aug. 29,* 2025.) Judge Scanlon also ordered the plaintiff to serve her statement of damages calculation, her response to the defendant's Rule 56.1 statement, and any Rule 56.1 counterstatement by September 18, 2025. (*Id.*)

On September 16, 2025, the plaintiff asked for an extension to October 20, 2025 to respond to the defendant's Rule 56.1 statement of facts because she was sick and needed time to "review over 80,000 . . . discovery documents." (ECF No. 161 at 1.) The Court granted the extension, extended the summary judgment briefing deadlines, and again warned the parties that "[g]iven the age of this case, the Court will not grant further extensions absent truly compelling circumstances." (*ECF Order dated Sept. 18, 2025.*)

In a letter dated October 17, 2025, the plaintiff requested a 90-day stay of proceedings because of her "current health problems." (ECF No. 163 at 1.) The Court denied the motion but extended the October 20, 2025 deadline to serve her statement of damages calculation and respond to the defendant's Rule 56.1 statement to November 3, 2025. (*ECF Order dated Oct. 21, 2025.*) On October 29, 2025, the plaintiff requested an extension of the Court's November 3, 2025 deadline from Judge Scanlon because she was "experiencing problems with [her] eyes and

head" and is "undergoing medical examinations" and "respectfully urge[d] the Court to understand that these conditions are out of my control." (ECF No. 164 at 1.) The Court denied the motion because the plaintiff "has not provided any support for her request," and directed her to serve her statement of damages calculation and her response to the defendant's Rule 56.1 statement by November 3, 2025. (*ECF Order dated Oct. 30, 2025.*) The Court again warned the plaintiff that she must comply with the Court's scheduling orders or risk sanctions, including considering the defendant's Rule 56.1 statement of material facts to be undisputed or dismissing her case. (*Id.*)

In a November 18, 2025 status report, the defendant explained that it served its Rule 56.1 statement on August 20, 2025, but the plaintiff had still not served the defendant with her damages calculation, "despite being required to do so by the Federal Rules, her discovery obligations, and by multiple orders from this Court." (ECF No. 165 at 3 (citing *ECF Orders dated June 10, 2025*; *June 16, 2025*; *October 21, 2025*; and *Oct. 30, 2025*).) Nor had the plaintiff responded to the Rule 56.1 statement or filed a Rule 56.1 counterstatement. (*Id.* at 2–3.) The defendant asked the Court to sanction the plaintiff, including by deeming the defendant's Rule 56.1 statement of facts undisputed, or dismissing the plaintiff's case. (*Id.* at 4.) The Court deemed the facts in the defendant's Rule 56.1 statement admitted for the purposes of summary judgment and directed the parties to proceed with summary judgment motion briefing. (*ECF Order dated Nov. 20, 2025.*) The Court ordered the defendant to file its motion by December 19, 2025, the plaintiff to file her opposition by January 23, 2026, and the defendant to file any reply by February 6, 2026. (*Id.*) The Court reminded the plaintiff yet again that she must comply with the Court's scheduling orders and warned that "[i]f the plaintiff does not comply with the

deadlines listed above or respond to the Court's orders, the Court may impose sanctions, including dismissing the plaintiff's case." (*Id.*)

On November 24, 2025, the plaintiff moved for reconsideration of the Court's October 30, 2025 order denying the plaintiff's request for extension of time, her third request for an extension since being served the defendant's Rule 56.1 statement. (ECF No. 166 at 1; *see also* ECF Nos. 161, 163, 164.) She filed two exhibits: (1) a November 3, 2025 letter from a physician at New York University Langone Eye Center saying that the plaintiff was seen for an appointment and referred to the Emergency Room for imaging; and (2) an appointment reminder for a new patient visit with a physician on December 1, 2025 at Weill Cornell Eye Associates. (ECF No. 166 at 6–9.) The Court denied the motion as untimely, because a motion for reconsideration of the Court's October 30, 2025 order was due by November 13, 2025 under Local Civil Rule 6.3. (*See ECF Order dated Nov. 25, 2025* (first quoting *Caidor*, 517 F.3d at 605; and then quoting *Superb Motors Inc. v. Deo*, No. 23-CV-6188, 2025 WL 1766225, at *1 (E.D.N.Y. June 26, 2025)).) The Court also noted that it had "repeatedly put the plaintiff on notice that the Court will not grant further extensions 'absent truly compelling circumstances'" and the "fact that the plaintiff has medical appointments is not a 'truly compelling circumstance[]' justifying further delay of her case." (*Id.* (alteration in original) (citing *ECF Orders dated Sep. 18, 2025*; *Oct. 21, 2025*; and *Oct. 30, 2025*).)

On December 19, 2025, the defendant moved for summary judgment. (ECF Nos. 167, 168.) Along with its motion, it filed its unopposed Rule 56.1 statement and 99 exhibits. (*See* ECF Nos. 169–173.) The Rule 56.1 statement includes extensive parallel citations to the exhibits, including three of the plaintiff's depositions. (*See, e.g.*, Def. 56.1 ¶ 138.) The defendant also filed a letter showing service by email and certified mail of its submissions on the

plaintiff. (ECF No. 175.) On January 21, 2026, two days before her opposition was due, the plaintiff requested another extension because she "ha[d] contacted a new attorney, who will take the case if the Court grants me a 60-day extension." (ECF No. 176 at 1.) She also noted that she needed more time to respond to the defendant's motion because she had "poor vision and headaches" which were "*not resolved yet*" and she was "*still ill*." (*Id.* (emphasis in original).) She attached a letter from a treating physician who described her difficulties with daily headaches and reading. (*Id.* at 4.)

The Court directed the plaintiff "to file a letter advising the Court of the name of the lawyer, contact information for the lawyer, and when the lawyer plans to file a notice of appearance by January 30, 2026"; the Court reserved decision on the motion for an extension. (*ECF Order dated Jan. 23, 2026.*) On January 30, 2026, the plaintiff requested an extension of this deadline to February 3, 2026, because her "prospective new attorney . . . needs more time to complete all necessary paper work before [she] can submit to the Court the attorney's name and contact information." (ECF No. 177 at 1.) The Court granted the motion. (*ECF Order dated Feb. 3, 2026.*) On February 3, 2026, the plaintiff requested another extension, this time until February 27, 2026, "to provide the Court with [her] decision on whether to retain counsel or proceed *pro se*." (ECF No. 178 at 1.) She also claimed that she "went to the City Bar Justice Center's Federal Pro Se Legal Assistance Project . . . and they are willing to provide [her] with some assistance" but "they will need some time to review and meet with [her]." (*Id.*)

On February 4, 2026, the Court denied the plaintiff's motions for additional extensions, and deemed the motion for summary judgment fully briefed:

> On January 23, 2026, the Court received the plaintiff's request for a 60-day extension. (ECF No. 176) She asserted that she had "contacted a new attorney" — whom she did not name — and that the attorney would "take the case" if the Court granted her request

for a 60-day extension. (ECF No. 176 at 1.) The Court ordered the plaintiff "to file a letter advising the Court of the name of the lawyer, contact information for the lawyer, and when the lawyer plans to file a notice of appearance by January 30, 2026." (*ECF Order dated Jan. 23, 2026.*) On February 3, 2026, the Court received, and granted, the plaintiff's motion for an extension of time until February 3, 2026 to provide the information about the lawyer. (ECF No. 177; *ECF Order dated Feb. 3, 2026.*) The plaintiff did not comply with the Court's January 23rd order. Instead, she filed another letter on February 3, 2026 in which she asked for an extension until February 27, 2026, "to provide the Court with [her] decision on whether to retain counsel or to proceed *pro se*." (ECF No. 178 at 1.) The plaintiff also explained that she went to the City Bar Justice Center's Federal Pro Se Legal Assistance Project that day "and they are willing to provide me with some assistance." (*Id.*) She did not provide any information about the "new attorney."

On August 12, 2025, the Court ordered the plaintiff to serve her statement of damages calculation and her response to the defendant's Rule 56.1 statement by September 18, 2025, and to file her response to the defendant's motion for summary judgment by November 17, 2025. (*ECF Order dated Aug. 12, 2025.*) The plaintiff has not complied with either order. She has, however, made five requests for extensions. (*See* ECF Nos. 161, 163, 164, 166, 176.) On November 20, 2025, the Court reset the plaintiff's deadline to oppose the motion for summary judgment to January 23, 2026. (*ECF Order dated Nov. 20, 2025.*) Two days before that deadline, the plaintiff filed this motion for yet another extension. (ECF No. 176.)

This case has been pending since 2018, and, as the Court has observed, is one of the oldest on the Court's docket. (ECF Order dated Oct. 30, 2025.) "[T]he Court has repeatedly put the plaintiff on notice that it would not grant further extensions 'absent truly compelling circumstances.'" (*ECF Order dated Sept. 25, 2025* (quoting *ECF Orders dated Sept. 18, 2025*, *Oct. 21, 2025*, *Oct. 30, 2025*).) The Court has also warned the plaintiff that she "must comply with the Court's scheduling orders," and that the failure to do so "may result in sanctions, including dismissal of her case." (*ECF Orders dated June 10, 2025*, *June 16, 2025*, *Oct. 21, 2025*, *Oct. 30, 2025*, *Nov. 20, 2025*, *Nov. 25, 2025* ("As the plaintiff is aware from multiple recent rulings in this case, '*pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.'" (quoting *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008) (citation omitted)).) Nevertheless, the Court has given the plaintiff multiple extensions, giving her ample time to retain new counsel. Most recently, the

> plaintiff claimed to be talking to a "new attorney" about taking her case, but declined to give the Court the lawyer's name or contact information in response to the Court's order. (*ECF Order dated Jan. 23, 2026*; ECF Nos. 177-78.) Under these circumstances, the plaintiff has not demonstrated "truly compelling circumstances" meriting yet another extension of her deadline to respond to the defendant's motion for summary judgment.
>
> The plaintiff has not responded to the defendant's motion for summary judgment, despite multiple extensions. The Court considers the motion fully briefed and will not accept additional briefs or letters in connection with the motion.

(*ECF Order dated Feb. 4, 2026.*)

## LEGAL STANDARD

Summary judgment is appropriate if the parties' submissions — including pleadings, deposition transcripts, affidavits, and other material in the record — show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law,'" and a factual dispute is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant has the burden of demonstrating that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020) (citation omitted).

"In considering a motion for summary judgment, the district court must draw all inferences in favor of the non-moving party, and may [grant summary judgment] only if the record reveals no genuine issue of material fact for trial." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023) (citation modified). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for

the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citation modified). The moving party cannot prevail on summary judgment "if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Banks*, 81 F.4th at 258 (quoting *Anderson*, 477 U.S. at 248).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Given the "'elusive nature of intentional discrimination,' . . . plaintiffs must often 'rely on bits and pieces of information to support an inference of discrimination.'" *Banks*, 81 F.4th at 259 (citation modified) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015)). Accordingly, "[b]ecause of the likelihood that 'direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Id.* (citation modified) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). "The resulting 'mosaic of intentional discrimination' . . . may be sufficient to show discrimination." *Id.* (quoting *Vega*, 801 F.3d at 86). "Nonetheless, even in the discrimination context, a plaintiff must still present more than conclusory allegations to survive a motion for summary judgment." *Id.* (citing *Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 92 (2d Cir. 1996)).

"Where a motion for summary judgment is unopposed, 'the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'" *Campbell v. FCI Lender Serv., Inc.*, No. 19-CV-2368, 2020 WL 13547914, at *3 (E.D.N.Y. Aug. 7, 2020) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)); *see also Amaker v.*

*Foley*, 274 F.3d 677, 680–81 (2d Cir. 2001). "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) (citing *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)). "In doing so, the court may rely on other evidence in the record even if uncited." *Id.* (citing Fed. R. Civ. P. 56(c)(3)).[16]

**DISCUSSION**

**I. Exhaustion**

Before a plaintiff can bring a Title VII or ADEA claim, she must "exhaust [her] claims in accordance with the regulations promulgated by the [EEOC]." *Miller v. Kempthorne*, 357 F. App'x 384, 385 (2d Cir. 2009).[17] Under Title VII and the ADEA, federal employees who believe they have been discriminated against must "initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *Gentile v. Potter*, 509 F. Supp. 2d 221, 233 (E.D.N.Y. 2007) ("The EEOC regulations require that a federal employee consult with a counselor at the employer agency's EEO office within forty-five days of the allegedly discriminatory or retaliatory act."). If the plaintiff's concerns are not addressed during pre-complaint counseling, the plaintiff must file a complaint with the "agency

[16] The plaintiff was represented by counsel when she filed the case and throughout discovery. She is proceeding *pro se* for summary judgment and has not opposed the motion. The standard for evaluating an unopposed motion for summary judgment is the same for *pro se* and counseled parties. *Minus v. City of New York*, 488 F. Supp. 3d 58, 63–64 (S.D.N.Y. 2020) (quoting *Vt. Teddy Bear Co.*, 373 F.3d at 244). The only difference is that a district court must ensure that a *pro se* party has been notified of "the nature and consequences of a motion for summary judgment." *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620 (2d Cir. 1999). The defendant gave the plaintiff that notice here. (ECF No. 174.)

[17] "While an aggrieved employee may proceed directly to federal court on an ADEA claim, [the plaintiff] became obligated to exhaust [her] administrative remedies when [s]he decided to commence proceedings with the EEOC." *Miller*, 357 F. App'x at 385 n.1 (citing *Wrenn v. Sec'y, Dep't of Veterans Affairs*, 918 F.2d 1073, 1078 (2d Cir.1990)).

that allegedly discriminated against the complainant" within 15 days of receiving notice of the failure to resolve the claim. 29 C.F.R. § 1614.106(a)–(b); *Gentile*, 509 F. Supp. at 233. The employee can bring a lawsuit in district court either 90 days after notice of the final agency decision on her EEOC complaint, or 180 days after filing the EEOC complaint if the agency has not issued a decision. 42 U.S.C. § 2000e-16(c). Title VII and the ADEA's exhaustion requirements are not jurisdictional; they are "claim-processing rules that must be timely raised to come into play." *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 544 (2019); *see also Briones v. Runyon*, 101 F.3d 287, 289–90 (2d Cir. 1996) (exhaustion under Title VII and the ADEA is "subject to waiver, estoppel, and equitable tolling.").

The defendant argues that all but one of the plaintiff's discrimination and retaliation claims from 2010 through April 19, 2013 are time-barred or otherwise unexhausted. (ECF No. 168 at 12–13.)[18] The plaintiff alleged discriminatory failure to promote her or hire her to professional positions beginning in August 2010, when she allegedly was awarded a "Level I Analyst Certificate" but kept her "title and pay status of Lab Technician," and that she complained to management and HR about her lack of promotion "more commensurate with her education and experience." (ECF No. 97 ¶¶ 28, 30.) She alleged that throughout 2011 and 2012, she continued to complain to management that the lab "had hired or promoted individuals less qualified than herself" (*Id.* ¶¶ 32–37), and that the FDA retaliated against her for these complaints by transferring her from the Microbiology Branch to the Chemistry Branch in January 2012, denying her a compensation step increase in April 2012, and downgrading her performance review for the year 2012 (*Id.* ¶¶ 83, 85, 87).

[18] The defendant does not move for summary judgment on the plaintiff's Title VII and ADEA discrimination claims related to the denial of her February 8, 2013 job application for the position of Microbiologist, GS-0403-05/07 (ID #: HHS-FDA-ORA-MP-13-820336). (*See* ECF No. 168 at 10 n.2.)

The plaintiff first contacted a counselor at the FDA's OEEO on around June 3, 2013, 102 days after learning she was not selected for a chemist position in February 2013, and even longer after the alleged discrimination in 2010–2012. (Def. 56.1 ¶¶ 91, 167; ECF Nos. 170-11 at 2–3, 173-4 at 2–3.) A plaintiff who has not submitted a discrimination claim to an EEOC counselor within the 45-day reporting period has not exhausted administrative remedies; thus, dismissal is warranted. *See Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) ("claims alleging conduct that occurred more than 45 days prior to the employee's initiation of administrative review are time-barred."). Moreover, the alleged discriminatory and retaliatory acts — promotions, transfers, and refusals to hire — are "[d]iscrete acts," and these "discrete discriminatory acts are not actionable if time barred." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"). Accordingly, the Court dismisses the plaintiff's Title VII and ADEA claims related to the discrete acts that occurred before April 19, 2013 as time-barred.

The defendant also argues that the plaintiff's failure to promote claims related to 12 positions to which she allegedly applied in 2013 should be dismissed because she did not exhaust administrative remedies for those discrete acts. (ECF No. 168 at 13–16; *see also* ECF No. 97 ¶¶ 72–81.) The plaintiff did not include allegations about any of these twelve positions in her 2013 OEEO complaint. (*see* ECF No. 170-11 at 2–4).

"A plaintiff exhausts 'only those claims that either were included in or are reasonably related to the allegations contained in [her] EEO[] charge.'" *Volmar v. Comm'r of Soc. Sec.*, No. 20-CR-1674, 2023 WL 11797930, at *9 (E.D.N.Y. Sept. 30, 2023) (quoting *Staten v.*

*Patrolmen's Benevolent Ass'n*, 736 F. App'x 17, 18 (2d Cir. 2018)); *see also Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003) ("[C]laims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency." (citation modified) (quoting *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)). "'A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" *Deravin*, 335 F.3d at 200–01 (quoting *Fitzgerald*, 251 F.3d at 359–60).[19] The "central question" is whether the EEOC charge "gave the agency adequate notice to investigate" the allegations before the plaintiff filed an action in district court. *Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d. Cir. 2008) (citation modified).

In her October 2013 OEEO complaint, the plaintiff alleged that the FDA discriminated against her based on age, national origin, and sex when it did not select her for the Microbiologist position. (ECF No. 170-11 at 3–4.) During the EEOC hearing process, the plaintiff amended her complaint to allege (1) that she received a negative performance review in retaliation for filing the EEOC complaint, and (2) that she was not selected for a Chemist or Microbiologist position in 2014 because of discrimination and retaliation. (ECF No. 173-16 at 2.)[20] But the plaintiff did not amend the OEEO complaint to add allegations about the other positions to which she applied in 2013, and the EEOC did not investigate her allegations about those job positions, nor did the AJ address them in her decision granting the FDA summary

[19] The Second Circuit has also found that a claim "alleging retaliation by an employer against an employee for filing an EEOC charge," and a claim alleging "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge" are "reasonably related to the claims asserted in an EEOC complaint." *Deravin*, 335 F.3d at 201 n.3 (citation modified).

[20] The denials of her 2014 job applications to these positions are not part of this lawsuit. (*See* ECF No. 97 ¶¶ 73–80.)

judgment. (*See* ECF No. 97 ¶¶ 73–80 (describing 2013 job applications); ECF No. 173-20 at 2–5 (2017 EEOC bench decision).) Because the only 2013 job application the plaintiff included in her OEEO complaint was for the Microbiologist position, (*see* ECF No. 170-11 at 4), the Court dismisses the plaintiff's Title VII and ADEA claims for the remaining 2013 job applications as unexhausted.

The defendant does not make exhaustion arguments about the following claims: that the FDA discriminated and retaliated against the plaintiff by denying her merit raises in 2014, 2016, and 2019; by lowering her performance evaluation in 2013 and 2019; and by failing to promote her after April 2013. (*See* ECF No. 97 ¶¶ 86–88; ECF No. 168 at 11–16.) Although these claims appear to be unexhausted, the Court will review these claims as well the exhausted claims. *See Volmar*, 2023 WL 11797930, at *9.

## II. Merits

### a. Legal Standard for Disparate Treatment Claims

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment" because of the individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Under the ADEA, it is unlawful for an employer to "discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).

Disparate treatment claims under Title VII and the ADEA are analyzed using the *McDonnell Douglas* burden-shifting framework. *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 209–10 (E.D.N.Y. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under the framework, the plaintiff must first establish a *prima facie* case of discrimination. *See id.* The plaintiff must show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the

circumstances give rise to an inference of discrimination." *Cyrus v. Lockheed Martin Corp.*, No. 22-CV-4115, 2024 WL 1072048, at *10 (E.D.N.Y. Mar. 12, 2024) (citation modified) (discussing the ADEA standard); *see also id.* at *6–7 (discussing the Title VII standard). Once the plaintiff makes that showing, "the burden of production [shifts] to the employer and requir[es] the employer to come forward with its justification for the adverse employment action against the plaintiff." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). If the employer meets this burden, "the presumption drops out of the picture," and the plaintiff must demonstrate that the employer's explanation is pretextual. *Id.* (citation modified); *see also Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 n.3 (2003)).

The defendant does not dispute that the plaintiff "is a member of a protected class," or that she was "qualified for her position." *See Cyrus*, 2024 WL 1072048, at *7, *10. (*See also* ECF No. 168 at 16–32.) The Court assumes without deciding that she "suffered [] adverse employment action[s]." *See Cyrus*, 2024 WL 1072048, at *7, *10. However, nothing in the record establishes a *prima facie* case of discrimination because as explained below, "the circumstances [do not] give rise to an inference of discrimination." *See id.*

**b. Inference of Discrimination in Title VII and the ADEA Disparate Treatment Claims**

"Under Title VII, a plaintiff can . . . [raise an inference of] discrimination with evidence that the employer acted against the plaintiff based solely upon his or her membership in a protected class, or 'because of both permissible and impermissible considerations — i.e., a mixed-motives case.'" *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 167 (E.D.N.Y. 2015) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 169 (2009)). "By contrast, an ADEA plaintiff . . . [raises an inference of] discrimination by showing that his or her

age was the 'but for' cause of the complained-of disparate treatment; the ADEA does *not* permit a 'mixed motives' theory of recovery." *Id.* (emphasis in original) (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014)). "An inference of discrimination can arise from . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (citation modified). A "plaintiff's mere subjective belief that [s]he was discriminated against does not sustain a discrimination claim." *Sethi v. Narod*, 12 F. Supp. 3d 505, 536 (E.D.N.Y. 2014) (citation modified).

The plaintiff asserted the following adverse actions: the FDA denied her merit raises in 2014, 2016, and 2019; lowered her performance evaluation for performance years 2013 and 2019; failed to promote her after April 2013; prevented her from renewing her PIV card — and therefore from accessing her office building — in 2020; and fired her in 2021 and 2022 because she was absent. (*See* ECF No. 97 ¶¶ 86–88, 97–147, 152–76.) As a preliminary matter, the plaintiff did receive a merit raise in 2019 (ECF No. 171-17 at 2 (SF-50)), and was promoted several times after April 2013 (ECF Nos. 171-6 at 2, 171-8 at 2, 171-9 at 2, 171-10 at 2, 171-13 at 2, 171-14 at 2, 171-24 at 2 (SF-50s)). As for the remaining claims, a reasonable jury could not conclude that the defendant was motivated by discrimination based on the plaintiff's national origin, sex, or age.

First, there is no evidence in the record that anyone at the FDA "critici[zed] . . . the plaintiff's performance in . . . degrading terms" related to her national origin, sex, or age, or made "invidious comments about others in the [plaintiff's] protected group[s]." *Littlejohn*, 795 F.3d at 312. Even viewing the evidence in the light most favorable to the plaintiff, the only

statements that could remotely be described as criticizing her performance were in Skorupsky's 2013 review; Skorupsky commented that that the plaintiff sometimes submitted "late samples" or had trouble "closing out reports/turning in worksheets" on time, and sometimes had "yelling, outbursts, obtuse/negative demeanor." (ECF No. 172-7 at 4–5.) These statements have nothing to do with the plaintiff's age, national origin, or sex. *See Littlejohn*, 795 F.3d at 312. Indeed, the plaintiff conceded in her 2014 deposition that no one at the FDA had ever made derogatory statements to her about her age, race or sex, or expressed bias against hiring Africans or Ethiopians. (2014 Dep. 53:23–55:17; 93:12-16.)

Second, there is no evidence that the FDA treated "employees not in the protected group[s]" "more favorab[ly]" than employees in the protected groups. *Littlejohn*, 795 F.3d at 312. To raise an inference of discrimination based on disparate treatment, the plaintiff must show that the "comparator employees are similarly situated in all material respects." *Carris v. First Student, Inc.*, 682 F. App'x 30, 32 (2d Cir. 2017) (summary order) (citation modified). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (citation modified). The "comparators must be similar enough to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, so as to isolate the critical independent variable." *Wimbish v. IBM, Inc.*, No. 23-CV-8327, 2026 WL 1481073, at *9 (S.D.N.Y. May 27, 2026) (citation modified). Failing to submit evidence that a comparator employee is similarly situated is fatal to a claim that a plaintiff's treatment raises an inference of discrimination. *Gonzalez v. Par. of Trinity Church*, No. 00-CV-9587, 2004 WL 1161175, at *3 (S.D.N.Y. May 24, 2004).

There is no evidence that employees who were younger, born in the United States, or male were given merit raises at higher rates, given higher performance evaluations, promoted more, fired less often, or otherwise treated better than those who shared the plaintiff's protected characteristics. In a deposition, the plaintiff named two other Black scientists who were fired during her tenure. (Feb. 2023 Dep. 251:15–256:13.) She said that one of them had a PhD, although she did not say what his job was, and that the FDA fired him in 2014 when he was still a new hire on probation. (*Id.* at 252:33–253:12). The other scientist was "doing a number of jobs" in "all different departments," and the FDA fired him at an unspecified time. (*Id.* at 253:21–254:18.)

These allegations do not raise an inference of discrimination. The plaintiff must show that employees who did not share her protected characteristics were treated better than those who did; the plaintiff did not make any such showing. *See Littlejohn*, 795 F.3d at 312. She did not establish that the other Black scientists who were fired were similarly situated to her. *See Wimbish*, 2026 WL 1481073, at *9. Nor did she say what these employees did, or what led to their termination. *See id.*

Moreover, there is no temporal connection between these incidents and the plaintiff's termination. *See Borzon v. Green*, No. 16-CV-7385, 2018 WL 3212419, at *9, *9 n.21 (S.D.N.Y. June 29, 2018) (explaining that "*Littlejohn*'s holding that replacement by a person outside one's protected class 'will ordinarily suffice for the required inference of discrimination' itself includes no temporal limitation" (quoting *Littlejohn*, 795 F.3d at 312–13), but stating, in a footnote, that "if the replacement occurred many months or years after the termination, replacement by a person outside of the protected class would likely not suffice."). The plaintiff testified that that the FDA terminated one of the Black employees in 2014, and gave no

information about when the other employee was fired. (Feb. 2023 Dep. 251:15–256:13.) The FDA terminated the plaintiff in 2021 and 2022 (ECF No. 173-12 at 521–27, 530–535), a time span that does not suggest discrimination, *see Borzon*, 2018 WL 3212419, at *9, *9 n.21.

Third, "the sequence of events leading to the plaintiff's discharge" does not raise an inference of discrimination. *See Littlejohn*, 795 F.3d at 312. A court determining whether the sequence of events raises and inference of discrimination may look to the "historical background" of the procedures followed, whether the procedures disproportionately disfavor those with protected characteristics, and whether decision makers "depart[ed] from the normal procedural sequence," when the normal procedural sequence would "strongly favor a decision contrary to the one reached." *Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp. 2d 133, 147 (E.D.N.Y. 2011) (citation modified).

The FDA stopped renewing PIV cards in 2020, because of the Covid-19 pandemic, to prevent in-person contact between people that might spread the virus. (ECF No. 173-12 at 441, 470.) The record does not include the historical context of the FDA's other policies about the plaintiff's PIV card and her ultimate firing, nor is there evidence of the history of how these policies were implemented over time. There is also no evidence that the procedures disproportionately affected any protected groups such that following them was discriminatory. *See Rivera*, 784 F. Supp. 2d at 147. Following these nondiscriminatory procedures does not demonstrate discrimination. *Id.*

The Covid-19-related pause on PIV card renewals made it much harder for the plaintiff to renew her PIV card than it would have been otherwise because the plaintiff would not have needed a valid New York State ID to renew her PIV card if she had been able to renew it in 2020, before her previous PIV card expired. (ECF No. 173-12 at 360–61, 660–61; Feb. 2023

Dep. 210:18–211:8.) It would have been reasonable for the FDA to depart from its PIV-renewal policy in the plaintiff's case, and to permit her to renew her PIV card without an unexpired New York State ID. But the choice not to grant the plaintiff an exception did not ultimately prevent her from renewing her PIV card. The FDA gave the plaintiff multiple opportunities to renew her PIV card after she had renewed her New York State ID. After she renewed her State ID, Thomas Herbst, the plaintiff's temporary supervisor, instructed her to renew her PIV card, gave her time to do so, and told her she could contact him for assistance, but she did not. (ECF No. 173-12 at 417–18; Feb. 2023 Dep. 220:19–221:5.) Over a month later, she wrote to the director of her lab, John Leazer, saying that she could not come to renew her PIV card because the FDA had revoked her access to the building. (ECF No. 173-12 at 407.) But there is no evidence she had ever contacted Herbst or tried anything else since his letter to gain access to the building to renew her PIV card. On this record, the FDA did not prevent the plaintiff from renewing her PIV card, and there is no evidence that the FDA's adherence to its PIV card renewal policies was motivated by discrimination.

"[T]he sequence of events leading to" the plaintiff's other adverse actions also does not raise an inference of discrimination. *Littlejohn*, 795 F.3d at 312; *see also Falcon v. City Univ. of New York*, 263 F. Supp. 3d 416, 427 (E.D.N.Y. 2017) (analyzing "sequence of events leading to" adverse action other than termination). There is no evidence in the record of the events leading up to the FDA denying the plaintiff merit raises, giving her low performance evaluations, or denying her promotions.

Fourth, and finally, the plaintiff's "subjective belief that [s]he was discriminated against does not sustain a discrimination claim." *Sethi*, 12 F. Supp. 3d at 536 (citation modified). She testified at her deposition that "we know [discrimination] because we feel it. We live in it. We

experience it day to day, and that is, to us, clear. We don't wait for us to be hanging on a tree." (Dec. 2023 Dep. 422:9-13.) But the plaintiff did not cite any evidence to support her claims of discrimination, and there is no such evidence in the record. *See Sethi*, 12 F. Supp. 3d at 536.

**c. Legal Standard for Retaliation Claims**

"Both Title VII and the ADEA prohibit retaliation" for properly raising complaints about employment discrimination, and "the same standards and burdens apply to claims under both statutes." *Matthews v. Rasa*, No. 24-2499, 2025 WL 3687759, at *2 (2d Cir. Dec. 19, 2025) (summary order) (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006)). "[T]he *McDonnell Douglas* framework applies to retaliation claims, whether brought under the ADEA [or] Title VII." *Carr v. New York City Transit Auth.*, 76 F.4th 172, 178 (2d Cir. 2023). An employee bringing a retaliation claim must show that: "(1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Id.* at 180. "The plaintiff's burden in this regard is '*de minimis*,' and 'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). "Once a *prima facie* case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (citation modified). If the employer makes this showing, then the burden shifts back to the plaintiff to establish "that the reason offered by the employer is merely pretext, and that the

employer's 'desire to retaliate' was the actual 'but-for cause of the challenged employment action.'" *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 14 (2d Cir. 2018) (summary order) (quoting *Ya–Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015)).

Assuming without deciding that (1) the plaintiff "engaged in protected activity" (2) "the defendant was aware of that activity" and (3) the plaintiff "was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse," nothing in the record establishes a *prima facie* case of retaliation because as explained below, there is no evidence of "a causal connection between the protected activity and the materially adverse action or actions." *Carr*, 76 F.4th at 180.

**d. Casual Connection in Title VII and ADEA Retaliation Claims**

"A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (quoting *Littlejohn*, 795 F.3d at 319). Title VII and ADEA retaliation claims require but-for causation — "that the adverse action would not have occurred in the absence of the retaliatory motive." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 304, 307 (2d Cir. 2021) (citation modified).

The plaintiff claimed that the FDA retaliated against her for her protected activities of "complaining to her managers and supervisors," filing a formal complaint of discrimination in October 2013, and filing this lawsuit on January 16, 2018. (ECF 97 ¶¶ 91, 96, 178, 203, 208.) As discussed above, the plaintiff claimed that adverse employment actions occurred when the

FDA denied her merit raises in 2014 and 2016, lowered her performance evaluations for performance years 2013 and 2019, prevented her from renewing her PIV card starting in April 2020, and fired her in 2021 and 2022. (*See id.* ¶¶ 86–88, 97–147, 152–76.) There is no evidence that these claimed adverse actions were retaliation for the plaintiff's protected activity.

First, there is no indirect evidence of a causal connection between her protected activities and her adverse actions based on temporal proximity. *See Natofsky*, 921 F.3d at 353. To support an inference of causation based on temporal proximity, "[t]he time period between the protected activity and the adverse action must be very close." *Freckleton v. Ambulnz NY LLC*, No. 21-CV-4615, 2022 WL 4644673, at *8 (E.D.N.Y. Sept. 30, 2022) (citation modified). But "[t]he Second Circuit has not defined a 'bright line' setting the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." *Marinacci v. United States Postal Serv.*, 403 F. Supp. 3d 116, 130 (E.D.N.Y. 2017). Some district courts in this Circuit have held that a gap of more than two months between protected activity and adverse action is too long to suggest causation. *Id.* at 130–31. One court has stated that "[a] gap of seven months between a protected activity and an alleged retaliatory act can be sufficient to infer causation . . . eleven months is, to say the least, at the very outer limit of the amount of time that is considered sufficient to establish causation . . . but a gap of twenty months suggests, by itself, no causality at all." *Clegg v. Coll. of Staten Island*, No. 17-CV-2777, 2021 WL 10351976, at *18 (E.D.N.Y. Sept. 30, 2021) (citation modified).

The plaintiff alleged that she complained to her managers repeatedly throughout 2010 to 2012. (ECF No. 97 ¶¶ 29–37.) The time between the latest of these complaints and the earliest alleged adverse action, either Skorupsky's March 2014 evaluation of the plaintiff's 2013 job performance or the plaintiff's undated 2014 merit-raise denial (*id.* ¶ 86; Def. 56.1 ¶¶ 66–69; ECF

No. 172-7 at 2.), is too long to suggest causation, *see Clegg*, 2021 WL 10351976, at *18.[21] The plaintiff filed her OEEO complaint in October 2013. (ECF Nos. 97 ¶ 91, 170-11 at 2–4.) Without more evidence, a reasonable jury could not conclude that the time lapse between her OEEO complaint and the 2014 adverse actions, or any subsequent adverse actions, suggested causation. *See Clegg*, 2021 WL 10351976, at *18. The plaintiff alleged that the FDA retaliated against her for filing this lawsuit in January 2018. (ECF No. 97 ¶ 96.) The next claimed adverse action was denying the plaintiff's PIV card renewal starting in 2020. (*Id.* ¶¶ 103, 147.) The gap between January 2018 and April 2020, or any subsequent adverse actions, is too long to suggest causation. *See Clegg*, 2021 WL 10351976, at *18.

There is no other indirect circumstantial evidence supporting an inference of causation. *See Natofsky*, 921 F.3d at 353. As explained above, the plaintiff did not cite any evidence of "disparate treatment of fellow employees who engaged in similar conduct." *Id.* (citation modified). She said that other Black scientists were fired (*see* Feb. 2023 Dep. 251:15–256:13), but she did not cite any evidence that they "engaged in similar conduct," *Natofsky*, 921 F.3d at 353, or were otherwise similarly situated to her such that their firing suggests retaliation, *see Wimbish*, 2026 WL 1481073, at *9.

Finally, there is no direct evidence of retaliation. Direct evidence of retaliation includes "evidence that Defendants threatened Plaintiff or made comments that would indicate that

[21] In any event, the plaintiff's 2013 performance evaluation was not an adverse action. The Second Circuit has held that "[l]ukewarm criticism . . . at the end of an otherwise positive review . . . does not constitute an adverse employment action" for the purpose of retaliation claims. *Tillery v. New York State Off. of Alcoholism & Substance Abuse Servs.*, 739 F. App'x 23, 26 (2d Cir. 2018) (summary order). In her 2013 review, the plaintiff's supervisor gave her a "Fully Successful" rating, the second highest of four ratings. (ECF No. 172-7 at 2.) She checked boxes which said that the plaintiff completed all her listed job duties and had the requisite technical competence for all of them. (*Id.* at 4–5.) She noted some inconsistency in the plaintiff's timeliness and friendliness but concluded that the plaintiff was overall successful at her job. (*Id.* at 4–8.) Later that year, the plaintiff received a time-off award and a step increase and corresponding raise. (ECF Nos. 171-7 at 2, 171-8 at 2.)

Defendants had any retaliatory motive." *Marinacci*, 403 F. Supp. 3d at 130. There is no evidence that FDA employees made any such comments or said anything at all about denying the plaintiff merit raises or giving her bad performance evaluations. The evidence in the record about the plaintiff's PIV renewal and terminations show that FDA employees were trying to comply with FDA policy, not that they were motivated by retaliatory animus. For example, Kyra Groves would not process the plaintiff's PIV card renewal because the plaintiff "didn't have the 2 forms of ID needed to process her application." (ECF No. 173-12 at 361.) Tabitha Seminaro said almost the same thing. (*Id.* at 317.) Dominique Stutts said that the FDA would revoke the plaintiff's building access if she did not have proper ID in "adherence to federal security guidance." (*Id.* at 318–19.) Her supervisor gave her extra time to renew her PIV card after she renewed her New York State ID and offered to meet with her to help her, but the plaintiff did not accept his offer. (*Id.* at 417–18; Feb. 2023 Dep. 220:19–221:5.) When the FDA fired her in 2021, it did so after an internal process, and after concluding that the plaintiff did not follow orders, was absent without authorization, and did not report for duty, not because of her protected actions. (Def. 56.1 ¶¶ 149–53; ECF No. 173-12 at 13–15, 282–83, 530–35.) Even then, the FDA reinstated her on February 14, 2022, because it had missed a step in the termination process, according to her union's rules. (Def. 56.1 ¶¶ 154–55; ECF No. 173-12 at 528.) On April 26, 2022, it terminated her again after renewed consideration, for the same reasons that it terminated her initially. (Def. 56.1 ¶¶ 160–65; ECF No. 173-12 at 521–27.)

The policies the FDA employees followed predated the plaintiff's difficulties renewing her PIV card and termination, and applied broadly to all employees, so the policies themselves were not retaliatory. *See Norman v. NYU Langone Health Sys.*, No. 20-3624, 2021 WL 5986999, at *5 (2d Cir. Dec. 17, 2021) (summary order) (concluding that termination was not

retaliatory when employer "had a policy of terminating employees who lacked an exemption and refused to receive the flu vaccine, and . . . [the] vaccine policy was broadly applicable."); *Fiore v. N. Shore Radiation Therapy*, No. 24-CV-3164, 2026 WL 1469451, at *12 (E.D.N.Y. May 26, 2026) (finding lack of reasonable accommodation was not retaliatory because the "[d]efendants' vaccine mandate stating [that] continued employment was contingent upon vaccination predated Plaintiff's accommodation request."). The evidence does not suggest that the FDA declined to renew the plaintiff's PIV card, and terminated her, for any reason other than adherence to its policies. *See Norman*, 2021 WL 5986999, at *5. She was "even granted . . . [ample] opportunity to comply with the polic[ies]." *Id.* Because the plaintiff "provide[d] no contrary evidence to show that" the FDA declined to renew her PIV card and terminated her for retaliatory reasons, she cannot support a retaliation claim for her PIV card issues and termination. *Fiore*, 2026 WL 1469451, at *12.

*   *   *

The plaintiff failed to raise an inference of discrimination, as required for her disparate treatment claims. *Cyrus*, 2024 WL 1072048, at *7, *10. She also did not demonstrate a causal connection between her protected activity and the adverse actions she claimed she suffered, as required for her retaliation claims. *Carr*, 76 F.4th at 178. Thus, the plaintiff failed to establish a *prima facie* case of discrimination or retaliation. *See id.*; *Cyrus*, 2024 WL 1072048, at *7, *10. Accordingly, the Court grants the defendant's motion for summary judgment.

## CONCLUSION

For the reasons stated above, the Court grants the defendant's motion for summary judgment. The parties are directed to file a joint pretrial order regarding the remaining claim that complies with the Court's Individual Rules within 30 days of the date of this Memorandum Decision and Order. The plaintiff is reminded that she must comply with court orders, and that failure to do so will result in sanctions, including dismissal of her remaining claim.

**SO ORDERED.**

s/Ann M. Donnelly
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
September 30, 2026